IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON

UNITED STATES OF AMERICA

v.                                    CRIMINAL NO. 2:13-00225

JAMES GREGORY GLICK
GUY R. MILLER,
SHAWN C. SIMON and
WILLIAM JAMEY THOMPSON

## GOVERNMENT'S MEMORANDUM IN SUPPORT OF PLEA AGREEMENT

Comes now the United States of America, by Thomas C. Ryan, Assistant United States Attorney for the Southern District of West Virginia, and respectfully files this Memorandum in Support of Defendants Glick, Miller and Thompson's respective guilty pleas to be entered as to Count Eight of the Indictment, alleging a violation of 18 U.S.C. § 844(i), the federal arson statute.  As set forth below, the United States asserts that there is an adequate basis in law and in fact for the Court to accept the respective Defendant's guilty plea on that count.

## Procedural History

On August 30, 2013, Defendants were charged with various crimes, including a violation of 18 U.S.C. § 844(i) as set forth in Count Eight of the Indictment, arising out of the February 1, 2012 intentional fire destroying a commercial property known as 111

1

Stratton Street ("111 Stratton Street") located in the town of Logan, Logan County, West Virginia.  See Docket No. 1, Pg. 13.

That statute provides, in relevant part, that "[w]hoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building . . . or other real or personal property used in interstate . . . commerce or in any activity affecting interstate  . . . commerce . . . and if personal injury results to any person, including any public safety officer performing duties as a direct or proximate result of conduct prohibited by this subsection, shall be imprisoned for not less than 7 years and not more than 40 years, fined under this title, or both . . . ."

At trial, the United States would have to prove the following elements beyond a reasonable doubt to convict Defendants of Count Eight:

1. Defendants, aided and abetted by each other or others, maliciously damaged or destroyed, or attempted to damage or destroy, by means of fire or an explosive, 111 Stratton Street;

2. 111 Stratton Street was a building or other real property used in interstate commerce or in any activity affecting interstate commerce;

3. Defendants acted maliciously; and

4. A public safety officer sustained a personal injury as a direct and proximate result of Defendants' conduct.[1]

As part of a plea agreement, Defendants Glick, Miller and Thompson agreed to plead guilty to, among other charges, Count Eight of the Indictment.   See Docket Nos. 51, 52 and 60.   The Court requested the parties submit additional briefing to support the factual and legal basis for the second element of Count Eight, that is, whether 111 Stratton Street was a building or other real property used in interstate commerce or in any activity affecting interstate commerce.

## Relevant Law on Interstate Commerce Element

A property's use in an activity affecting interstate commerce is an essential element of the crime of arson under 18 U.S.C. § 844(i). See Bennett, 984 F.2d at 607; United States v. McGuire, 178 F.3d 203, 205 (3d Cir. 1999).   Property that is offered for rent or used as rental property is considered to be "used in interstate commerce" within the meaning of this statute.   Russell v. United States, 471 U.S. 858, 862 (1985)("By its terms, however, the statute [18 U.S.C. §844(i)] only applies to property that is "used" in an "activity" that affects [interstate] commerce.   The rental of real estate is

---

[1]    See United States v. Bennett, 984 F.2d 597, 607 (4th Cir. 1993).

3

unquestionably such an activity.").[2]  Further, the Fourth Circuit concluded that "Russell thus holds that rental property is *per se* property used in an activity affecting interstate commerce.") United States v. Parsons, 993 F.2d 38, 40 (4th Cir. 1993).

In Jones v. United States, 529 U.S. 848 (2000), the Supreme Court held that the intentional burning of an owner-occupied personal residence was not prosecutable under 18 U.S.C. § 844(i) because there was not sufficient nexus to interstate commerce.  Following Jones, the Fourth Circuit stated,

> The Jones court established a two-part inquiry to determine whether a building fits within the strictures of § 844(i).  First, courts must inquire into the function of the building itself.  Second, courts must determine whether that function affects interstate commerce.

United States v. Terry, 257 F.3d 366, 368-69 (4th Cir. 2001) (citations and quotations omitted).[3]  Jones further stated that

---

[2]   See also United States v. Aman, 480 Fed. Appx., 221 (4th Cir. 2012).

[3]   See also United States v. Iodice, 525 F.3d 179, 183-86 (2d Cir. 2008)("Our sister circuits have concluded that § 844(i) applies to temporarily vacant buildings as long as there was evidence at trial of sufficiently definite plans to return the property to the stream of commerce."); United States v. Estate of Parsons, 314 F.3d 745, 752 (5th Cir. 2002)("Despite the fact that Parsons's hotel may have been closed for the winter season, a temporary cessation of activity does not place the hotel beyond the reach of 18 U.S.C. § 844(i) if there is intent to return to the stream of commerce.") vacated on other grounds, 367 F.3d 409 (5th Cir. 2004); Martin v. United States, 333 F.3d 819, 821 (7th Cir. 2003) ("the temporary suspension of

interstate commerce requirement "is most sensibly read to mean active employment for commercial purposes, and not merely a passive, passing, or past connection to commerce." Id. at 855.  Some courts have interpreted the words "active employment" in Jones to limit prosecutions under 18 U.S.C. § 844(i) to only commercial buildings that were rented at the time of the fire.  See Ryan, 227 F.3d at 1061. The Second Circuit, however, cautioned against that narrow approach as it overstates the holding in Jones.[4]

---

commercial activity in a building that otherwise meets the interstate commerce requirements of § 844(i) does not permanently remove that building from the scope of the arson statute."); United States v. Williams, 299 F.3d 250, 254-55 (3d Cir. 2002); United States v. Ryan, 227 F.3d 1058, 1061 (8th Cir. 2000).

[4]    In Iodice, the Second Circuit, 525 F.3d at 183-84, provided the following:

> We have observed that "it is always hazardous to seize upon a single word or phrase in a judicial opinion and build upon it a rule that was not in issue in the case being decided." Howard v. Senkowski, 986 F.2d 24, 28 (2d Cir.1993). In that vein, we note that Jones concluded only that § 844(i) did not cover a private, owner-occupied, residential dwelling that served no commercial purpose whatsoever. 529 U.S. at 854, 120 S.Ct. 1904. In doing so, the Court rejected the argument that the structure was "used in" interstate commerce merely due to its receipt of interstate goods like energy and its role in the owner's procurement of insurance and financing. See id. at 855, 120 S.Ct. 1904. However, the Court did not confront and thus did not address those circumstances that serve to remove a commercial building that would otherwise be covered by § 844(i), but is temporarily inoperative, from the protection of that statute. To the extent that Iodice

Rather, the more appropriate rule, as it relates to determining whether a clearly commercial building satisfies the interstate commerce element was summarized by the Third Circuit:

> Once the business nature of the property at issue is established, courts will presume, absent indicia of an intention to permanently remove the property from the stream of commerce, that the requisite nexus between the property and interstate commerce is satisfied, notwithstanding temporary changes or modifications in the use of the property.

Williams, 299 F.3d at 254-55 (quoting dicta from United States v. Gaydos, 108 F.3d 505, 510 (3d Cir. 1997)).

Once the function of the building is established, a jury would not be limited to considering only the day or moment of the actual fire charged in the indictment in determining whether a building was used in or affected interstate commerce. See United States v. Grossman, 608 F.2d 534 (4th Cir. 1979) (affirming interstate connection of a backhoe that had been located in a single state for two-and-a-half years, rejecting argument that "841(i) requires a contemporaneous connection with interstate commerce without regard to past interstate movement"). Likewise, the fact that the building in question may have been vacated before the fire was set does not necessarily negate the showing of use in interstate commerce. See

now urges us to adopt an overly literal reading of the "active employment" phrase in Jones, we refuse to do so.

6

United States v. Milligan, 3 Fed. Appx. 169, 170-171 (4th Cir. 2001).

Rather, a jury may consider whether the building had been routinely used and offered as a rental property prior to the formation of any intent or plan to burn the building. See Parsons, 993 F.2d at 41 ("It was certainly rational [for the jury] to also conclude that Parsons never intended to move into the house or to remove it from the rental market. Simply put, the jury concluded that she planned to have the house burned . . . .");

Further, the mere intent to remove the building from commercial use by burning it down does not automatically negate the proof of use in interstate commerce that the government must show in this case. See id.; see also United States v. Medeiros, 897 F.2d 13, 16-17 (1st Cir. 1990)(rejecting lack of interstate commerce defense where any break in the interstate commerce was "connected to the planned arson itself.").

A jury may also consider evidence of how the property was classified for insurance and property-tax purposes in deciding whether the property in question was rental property and, thus, used in interstate commerce within the meaning of the statute. Milligan, 3 Fed. Appx. at 170; Parsons, 993 F.2d at 41; Martin, 333 F.3d at 822.

## **Anticipated Facts**

If the case were to proceed to trial, the United States anticipates introducing the following facts allowing the jury to find that the government proved beyond a reasonable doubt that 111 Stratton Street was used in interstate commerce or in an activity affecting interstate commerce.

The Weiner family has owned the building since approximately 1973 and it has been used as a commercial rental property that entire time. Since at least 2007, the 111 Stratton Street was exclusively owned by Marla (f/k/a Mark) Weiner. The most recent tenant was the law offices of Avis, Witten and Wandling, L.C. ("Avis Witten"), who moved out in approximately 2009 or 2010. Rather than attempt to find another long-term tenant, Weiner decided to sell the building.

Since around the time Avis Witten moved out, Weiner had on-again, off-again discussions with the father of Jamil Allie ("J. Allie")[5] about selling the building. J. Allie and his brother, Mike Allie ("M. Allie")[6] owned a real estate appraisal business and worked with their father in the commercial leasing business.

Weiner initially offered to sell the building for $300,000, but J. Allie's father refused. Over time, Weiner continued to gradually

---

[5]    J. Allie is identified as "Known Person One" in the Indictment.

[6]    M. Allie is identified as "Known Person Two" in the Indictment.

8

lower the price.   J. Allie's father was experiencing health problems and decided against purchasing the building at any price.

In the summer of 2011, Weiner called upon J. Allie's father again to make sure he was not interested in purchasing the property.   At that point, J. Allie asked his father if he could engage in negotiations directly with Weiner, which he did.

J. Allie asked for Weiner's absolute-lowest price.   Weiner responded with $45,000 and J. Allie accepted.   Weiner agreed to have a local attorney, Phil Amick, prepare the deed.   In the meantime, however, Weiner gave J. Allie a key to the building so he could begin showing the space to prospective tenants and make renovations.

J. Allie surveyed the structure thoroughly and quickly realized that the building was going to need significant updates.   While the right-side unit of 111 Stratton Street in which Avis Witten formally occupied was relatively market ready, the unit on the left side had not been renovated in probably over forty years.

Nonetheless, J. Allie began contacting local prospective tenants.   Sometime in the fall of 2011, J. Allie showed the property to a local attorney, Carl Adkins, who brought two of his office workers, Corral Neal and Joy Chillers, with him to look at the space. J. Allie recalled offering to rent the right-side unit for $1,500

or the entire building for $2,200.  Ultimately, Mr. Adkins passed on the opportunity to rent the building.

Ms. Neal recalled viewing the space, but believed it was too outdated.  Ms. Chillers also recalled viewing the space, but believed that it was more space than Mr. Adkins needed.[7]

J. Allie also spoke with someone at the Logan County Day Report Center about moving a portion of its operations into 111 Stratton Street.  Further, J. Allie's wife would testify that she approached the Logan County Commission about moving the Health Department into the space.

Within those first few months, J. Allie realized that he was not going to have any immediate success in renting the building, especially without significant renovations.[8]

At that point, J. Allie approached Defendant Glick.  These two individuals devised the scheme to burn 111 Stratton Street for insurance proceeds.  They agreed that Glick would involve a mutual friend, Defendant Thompson, in placing a commercial insurance policy on the building with full knowledge of their intentions.

---

[7]    Mr. Adkins was killed in an accident on March 1, 2013.

[8]    The facts set forth *supra* were not included in Defendant Glick's Stipulation of Facts because he did not have firsthand knowledge of J. Allie's attempt to rent 111 Stratton Street before they devised the scheme to burn the building for insurance proceeds.

10

On December 30, 2011, J. Allie and Weiner finally executed a deed prepared by Attorney Amick transferring 111 Stratton Street even though the property had already been in J. Allie's possession since that summer.  J. Allie recorded the deed on January 11, 2012.  <u>See</u> Exhibit A.  J. Allie then had Attorney Amick prepare a deed purportedly transferring 111 Stratton Street to Defendant Glick on January 9, 2012 for a sale price of $50,000.  The deed was recorded on January 13, 2012.  <u>See</u> Exhibit B.

After the fire and demolition of the remaining structure, Defendant Glick would use the remaining lot as a much-needed parking lot for his restaurant across the street, "317."

On January 10, 2012, Defendant Thompson submitted a commercial insurance application to a wholesale broker, Risk Placement Services ("RPS"), located in Lexington, Kentucky.  <u>See</u> Exhibit C.  Defendant Thompson represented on the application that "Owner intends on remodeling & renting out to Doctors & Lawyers in the area."  Further, Defendant Thompson represented that the nature of the property's operations were "office rentals, doctors, lawyers" and that those operations would generate $20,000 a month.  <u>Id.</u>  Finally, Defendant Thompson falsely represented that the replacement cost value was $1 million.  <u>Id.</u>

RPS, in turned, offered the application on the surplus lines insurance market.  General Star Indemnity Company ("General Star") expressed interest in placing coverage.  RPS communicated General Star's conditions to Defendant Thompson on January 11, 2012.  See Exhibit D.

On January 17, 2012, General Star placed commercial property insurance coverage for $1 million on 111 Stratton Street understanding that the property was to be used for office space.  See Exhibit E.

With coverage in place, J. Allie and Defendant Glick decided to have the building burned while Defendant Glick was out of town at a food conference in Louisville, Kentucky.  J. Allie agreed to have his brother, M. Allie, contact another mutual friend, Defendant Miller, to arrange to have the building burned.

Shortly before the fire, Defendant Miller devised a plan to execute the arson scheme, which involved using Attorney Amick's office as an access point.  On the night of the fire, Defendant Miller approached his cousin, Defendant Simon, and Michael D. Williams about participating in the arson.[9]  The three men drove to a parking lot

---

[9]   Williams is charged by Information in Case No. 2:13-00270. There is some factual dispute among Defendants Miller and Simon and Defendant Williams about who actually ignited the fire.

on the Main Street side of Attorney Amick's office.  They went through the lawyer's office.  See Exhibit F.[10]

A camera from the Logan County Courthouse facing down Stratton Street towards Dingess Street captured at least one figure exiting from near Attorney Amick's office and entering 111 Stratton Street around 1:45 a.m.  See Exhibit G.  Around 2:09 a.m., Tim Duncan was driving through town and pulled onto Stratton Street just as the building caught fire. Duncan called 911.  See Exhibit G.

The cameras from the Logan County Courthouse facing the Main Street side captured Defendant Simon's steel gray Chevrolet Malibu speeding away from the fire scene at 2:10 a.m.  See Exhibit H.

The next morning, J. Allie called Defendant Glick in Louisville to tell him that 111 Stratton Street had burned.  He returned to the fire scene and spoke with West Virginia Assistant State Fire Marshal Jason Baltic.  Defendant Glick stated that he had intended to rent 111 Stratton Street to a doctor, Dr. Fernando Gonzalez-Ramos.  See Exhibit I.  Baltic's investigation quickly confirmed the cause of the fire was arson, including the fact that a gas can was found just inside the front door.  See Exhibit I.

---

[10]   The aerial view of Logan is marked with two red circles.  The left circle notates the Main Street parking lot where Defendants Miller, Simon and Williams parked.  The right circle notates where 111 Stratton Street was formally located. To get from the Main Street side to the Stratton Street side, these defendants passed through Attorney Amick's law office, which spans the entire block.

In the next day or so, Defendant Glick realized that the security camera operating at 317 captured Defendants Miller, Simon and Williams entering and exiting Attorney Amick's law office around the time of the fire.   Defendant Miller came to Defendant Glick's office at the restaurant.   The two men agreed to destroy the digital video recorder ("DVR").   Defendant Miller took the DVR and gave it to Defendant Simon to destroy, which he did.

During a service call on February 3, 2012, a technician from Defendant Glick's security company was in Logan performing work on Defendant Glick's house.   See Exhibit J.   The technician recalled Defendant Glick stating that his DVR at 317 had malfunctioned and needed to be replaced as soon as possible.

On February 8, 2012, Defendant Thompson submitted a fraudulent insurance claim to General Star through RPS via facsimile.   See Exhibit K.   Greg Bailey, a claims investigator for General Star, interviewed Defendant Glick and he reiterated his intentions to use the building as a commercial rental property.

On April 16, 2012, Defendant Glick executed a fraudulent Sworn Proof of Loss Statement and Defendant Thompson submitted it to General Star through RPS via facsimile.   See Exhibit L.

Without sufficient evidence to prove Defendant Glick's involvement in the arson, General Star sent a $1,010,000 check via

14

Federal Express, representing a full payout on the commercial insurance policy.  See Exhibit M.

Before the conspiracy, continuing through its execution and through the present, Weiner and then Defendant Glick has paid property taxes on 111 Stratton Street at a commercial property rate. See Exhibit N.[11]

Following the fire, Defendant Glick had the remaining structure demolished and has been using the property as a parking lot for his restaurant.  See Exhibit O.

## Discussion

The Court can find a sufficient factual and legal basis on four different grounds that 111 Stratton Street was used in interstate commerce and in an activity affecting interstate commerce to accept the guilty plea of Defendants Glick, Miller and Thompson to Count Eight in the Indictment.

### A.    111 Stratton Street Only Serves A Commercial Function.

As a threshold issue under Jones, the evidence would clearly establish that the function – the only function – of 111 Stratton Street was to be used as a commercial rental property.  Before, during and after the arson and insurance fraud conspiracy, the

---

[11]    111 Stratton Street was assessed and taxed as a "Class IV" property, which generally is applied to all non-residential property situated within a municipality.

15

building has been treated as a commercial building for tax purposes. <u>See</u> Exhibit E.  This building never served any other known purpose. Relying upon <u>Williams</u>, the Court can conclude that there is sufficient evidence to find that 111 Stratton Street was involved in interstate commerce.

**B.**    **The Supplemental Facts Provided By J. Allie's Proffered Testimony Demonstrate "Active Employment" Of 111 Stratton Street In Interstate Commerce.**

Beyond reliance upon <u>Williams</u>, the Court can further find the supplemental facts provided above from the anticipated testimony of J. Allie to support a factual basis of "active employment" if literally required after <u>Jones</u>.  Shortly before the February 1, 2012 fire, J. Allie actively attempted to lease the office space in 111 Stratton Street.  As Ms. Neal and Ms. Chillers recall, J. Allie showed the space to their employer and local attorney, Carl Adkins. Further, J. Allie himself, and through his wife, made other inquires to rent the property.  These supplemental facts beyond the respective defendants' stipulation of facts demonstrate temporal "active employment," thus allowing the Court to find sufficient facts to support the interstate commerce element.[12]

---

[12]    Only really after it became apparent to J. Allie that the prospects for renting 111 Stratton Street were dim was it that he and Defendant Glick hatched the scheme to burn the building.  <u>Parsons</u> and <u>Medieros</u> stand for the proposition that a scheme to burn a

**C.   The Commercial Insurance Policy Application Necessarily Required Defendants To Intend To Involve 111 Stratton Street In An Activity Affecting Interstate Commerce.**

The Court can also rely upon the co-conspirators' stated intentions.  By its very nature, this particular scheme required the defendants to inject 111 Stratton Street into an activity affecting interstate commerce.  Defendants Glick and Thompson procured a commercial insurance policy affirmatively representing to General Star their intent that this building would be actively marketed and used for commercial rental space.  That act alone – obtaining a commercial insurance policy based on those affirmative representations – is sufficient to find a factual basis for the defendants' guilty plea to Count Eight.

To execute this particular scheme, these defendants, like Milligan, had to place this building in the interstate commercial insurance market to obtain coverage.  That representation allowed the defendants to increase the replacement cost value, making the arson scheme lucrative enough to execute.  General Star – or any other commercial insurance carrier – would not have rented the property for any residential or non-commercial reason.

---

building cannot serve as the basis to remove the structure from interstate commerce.

The recent application and procurement of commercial insurance makes this case distinguishable from Ryan.  In that case, the only evidence offered of interstate commerce was that the building was owned by defendant's father who was an out-of-state resident.  The building was technically leased to a shell company also owned by the defendant's father.  Finally, the defendant had taken some steps to sell the building but never actually listed it for sale and the building was heated by natural gas.  227 F.3d at 1060.

Here, unlike Ryan, the trial evidence would show that the defendants predicated the entire scheme upon obtaining a falsely inflated commercial insurance policy.  To do so, Defendant Thompson had to apply for insurance on the interstate market through RPS, a wholesale broker in Kentucky.  The application and placement of that insurance policy on 111 Stratton Street for the purpose of executing this arson scheme constitutes an activity affecting interstate commerce.

Further, Defendant Glick affirmatively represented to the Assistant State Fire Marshal Baltic and Investigator Bailey that he intended to lease the building to Psychological Associates and Dr. Gonzalez-Ramos.  Although those statements are certainly part of the conspirator's alibi, Defendant Glick in fact made those affirmative representations.  Thus, a jury could have rightfully concluded on

18

Defendant Glick's stated intentions alone that he used 111 Stratton Street in interstate commerce.

> **D.  Defendant Glick's Admitted Intent To Use The Remaining Lot at 111 Stratton Street As A Parking Lot For 317 Is Sufficient To Show That The "Other Real Property" Was Intended To Be Used In Interstate Commerce.**

Finally, the Court can find a sufficient factual basis because Defendant Glick admitted that he wanted to participate in the scheme to maliciously damage 111 Stratton Street because, in at least part, he wanted to use the remaining land as a parking lot for his restaurant.  See Defendant Glick's Plea Agreement, Ex. B, ¶ 8.  18 U.S.C. § 844(i) not only covers the building itself, but also "other real or personal property."  From the outset of the arson scheme, Defendant Glick intended to use the remaining lot in his commercial enterprise.  See Aman, 480 Fed. App'x at 224-25 (holding that commercial use of a property in running a restaurant "is enough to establish the necessary connection to interstate commerce")(citing Terry, 257 F.3d at 370-71; United States v. Soy, 413 F.3d 594, 603-04 (7th Cir. 2005); United States v. Joyner, 201 F.3d 61, 79 (2d Cir. 2000); United States v. Serang, 156 F.3d 910-913-14 (9th Cir. 1998)).  Indeed, that remaining real property is still used in supporting Defendant Glick's commercial endeavors.  See Exhibit O.

Accordingly, the Court need look beyond Paragraph 8 of Defendant Glick's Stipulation of Facts to find the necessary interstate commerce nexus to support a guilty plea to Count Eight.

## Conclusion

Based on the foregoing, the United States urges this Court to find that there is an adequate factual and legal basis to accept Defendants Glick, Miller and Thompson's guilty plea to Count Eight of the Indictment, charging them with a violation of 18 U.S.C. § 844(i).

Respectfully submitted,

R. BOOTH GOODWIN II
United States Attorney


s/ *Thomas C. Ryan*
THOMAS C. RYAN
Assistant United States Attorney
WV State Bar No. 9883
300 Virginia Street, East
Room 4000
Charleston, West Virginia 25301
Telephone:  304-345-2200
Fax:  304-347-5104
E-mail:  thomas.ryan@usdoj.gov

## CERTIFICATE OF SERVICE

It is hereby certified that the foregoing "GOVERNMENT'S MEMORANDUM IN SUPPORT OF PLEA AGREEMENT" has been electronically filed and service has been made on opposing counsel by virtue of such electronic filing this 23rd day of October, 2013 to:

James Cagle, Esquire
caglelaw@aol.com

Michael W. Carey, Esquire
mwcarey@csdlawfirm.com

Philip Sword, Esquire
psword@shumanlaw.com

Brian D. Yost, Esquire
wvlawyer@att.net

Tim Carrico, Esquire
tcarrico@carricolaw.com

s/ *Thomas C. Ryan*
THOMAS C. RYAN
Assistant United States Attorney
WV State Bar No. 9883
300 Virginia Street, East
Room 4000
Charleston, West Virginia 25301
Telephone:  304-345-2200
Fax:  304-347-5104
E-mail:  thomas.ryan@usdoj.gov