

**United States Department of Justice**

*United States Attorney*
*Southern District of West Virginia*

---

| | |
|---|---|
| *Robert C. Byrd United States Courthouse*<br>*300 Virginia Street, East*<br>*Suite 4000*<br>*Charleston, WV 25301*<br>*1-800-659-8726* | *Mailing Address*<br>*Post Office Box 1713*<br>*Charleston, WV 25326*<br>*304-345-2200*<br>*FAX: 304-347-5104* |

September 26, 2013

FILED

NOV - 6 2013

TERESA L. DEPPNER, CLERK
U.S. District Court
Southern District of West Virginia

James M. Cagle, Esquire
1018 Kanawha Blvd., East
Suite 1200
Charleston, WV 25301-2827

Michael W. Carey, Esquire
Carey Scott & Douglas PLLC
P.O. Box 913
Charleston, WV 25323-0913

Re:   United States v. James Gregory Glick
      Criminal No. 2:13-cr-00225-01 (USDC SDWV)

Dear Mr. Cagle and Mr. Carey:

This will confirm our conversations with regard to your client, James Gregory Glick (hereinafter "Mr. Glick"). As a result of these conversations, it is agreed by and between the United States and Mr. Glick as follows:

1. **PENDING CHARGES.** Mr. Glick is charged in a 36-count indictment as follows:

   (a)   Count One charges Mr. Glick with a violation of 18 U.S.C. § 1349 (conspiracy to commit mail fraud and wire fraud);

   (b)   Counts Two through Four charge Mr. Glick with a violation of 18 U.S.C. §§ 1343 and 2 (wire fraud);

   (c)   Count Five charges Mr. Glick with a violation of 18 U.S.C. §§ 1341 and 2 (mail fraud);

GG
--------
Defendant's
Initials

James M. Cagle, Esquire
Michael W. Carey, Esquire
September 26, 2013                    Re: James Gregory Glick
Page 2

     (d)    Count Six charges Mr. Glick with a violation of 18 U.S.C. §§ 844(h)(1) and 2 (use of fire to commit mail fraud and wire fraud);

     (e)    Count Seven charges Mr. Glick with a violation of 18 U.S.C. § 844(n) (arson conspiracy);

     (f)    Count Eight charges Mr. Glick with a violation of 18 U.S.C. §§ 844(i) and 2 (arson);

     (g)    Count Nine charges Mr. Glick with a violation of 18 U.S.C. § 1512(c)(1) (obstruction of justice);

     (h)    Counts Ten through Eighteen charge Mr. Glick with violations of 18 U.S.C. §§ 1957 and 2 (unlawful monetary transactions); and

     (i)    Counts Nineteen through Thirty Six charge Mr. Glick with violations of 31 U.S.C. §§ 5324(a)(3) and (d)(2), and 18 U.S.C. § 2 (structuring).

    2.   **RESOLUTION OF CHARGES.**  Mr. Glick will plead guilty to Counts One, Eight, Eighteen and Twenty-Six of said indictment, which charge him with violations of 18 U.S.C. § 1349, 18 U.S.C. §§ 844(i) and 2, 18 U.S.C. §§ 1957 and 2, and 31 U.S.C. §§ 5324(a)(3) and (d)(2). Following final disposition, the United States will move the Court to dismiss Counts Two through Seven, Nine through Seventeen, Nineteen through Twenty-Five, and Twenty-Seven through Thirty-Six in Criminal No. 2:13-cr-00225-01 as to Mr. Glick.

    3.   **MAXIMUM POTENTIAL PENALTY.**  The maximum penalty to which Mr. Glick will be exposed by virtue of this guilty plea is as follows:

**<u>Count One</u>**

     (a)    Imprisonment for a period of twenty years;

     (b)    A fine of $250,000, or twice the gross pecuniary gain or twice the gross pecuniary loss resulting from defendant's conduct, whichever is greater;

*66*
_____
Defendant's
Initials

James M. Cagle, Esquire
Michael W. Carey, Esquire
September 26, 2013                    Re: James Gregory Glick
Page 3

    (c)  A term of supervised release of three years;

    (d)  A mandatory special assessment of $100 pursuant to 18 U.S.C. § 3013; and

    (e)  An order of restitution pursuant to 18 U.S.C. §§ 3663A and 3664, or as otherwise set forth in this plea agreement.

**Count Eight**

    (a)  Imprisonment for a period of at least seven but not more than forty years;

    (b)  A fine of $250,000, or twice the gross pecuniary gain or twice the gross pecuniary loss resulting from defendant's conduct, whichever is greater;

    (c)  A term of supervised release of five years;

    (d)  A mandatory special assessment of $100 pursuant to 18 U.S.C. § 3013; and

    (e)  An order of restitution pursuant to 18 U.S.C. §§ 3663A and 3664, or as otherwise set forth in this plea agreement.

**Count Eighteen**

    (a)  Imprisonment for a period of ten years;

    (b)  A fine of $250,000, or twice the gross pecuniary gain or twice the gross pecuniary loss resulting from defendant's conduct, whichever is greater;

    (c)  A term of supervised release of three years;

    (d)  A mandatory special assessment of $100 pursuant to 18 U.S.C. § 3013; and

    (e)  An order of restitution pursuant to 18 U.S.C. §§ 3663A and

*GC*
Defendant's
Initials

James M. Cagle, Esquire
Michael W. Carey, Esquire
September 26, 2013                          Re: James Gregory Glick
Page 4

        3664, or as otherwise set forth in this plea agreement.


**Count Twenty-Six**

    (a)  Imprisonment for a period of ten years;

    (b)  A fine of $500,000, or twice the gross pecuniary gain or
         twice the gross pecuniary loss resulting from defendant's
         conduct, whichever is greater;

    (c)  A term of supervised release of three years;

    (d)  A mandatory special assessment of $100 pursuant to 18
         U.S.C. § 3013; and

    (e)  An order of restitution pursuant to 18 U.S.C. §§ 3663 and
         3664, or as otherwise set forth in this plea agreement.

**Maximum Potential Penalty**

    (a)  Imprisonment for a period of at least seven but not more
         than 80 years;

    (b)  A fine of $1,250,000, or twice the gross pecuniary gain
         or twice the gross pecuniary loss resulting from
         defendant's conduct, whichever is greater;

    (c)  A term of supervised release of five years;

    (d)  A mandatory special assessment of $400 pursuant to 18
         U.S.C. § 3013; and

    (e)  An order of restitution pursuant to 18 U.S.C. §§ 3663,
         3663A and 3664, or as otherwise set forth in this plea
         agreement.


    4.   **SPECIAL ASSESSMENT.**  Prior to the entry of a plea pursuant
to this plea agreement, Mr. Glick will tender a check or money order

                                        66
                                   _____
                                   Defendant's
                                   Initials

James M. Cagle, Esquire
Michael W. Carey, Esquire
September 26, 2013                          Re: James Gregory Glick
Page 5

to the Clerk of the United States District Court in the amount of
$400, which check or money order shall indicate on its face the name
of defendant and the case number.   The sum received by the Clerk will
be applied toward the special assessment imposed by the Court at
sentencing.   Mr. Glick will obtain a receipt of payment from the
Clerk and will tender a copy of such receipt to the United States,
to be filed with the Court as an attachment to this plea agreement.
If Mr. Glick fails to provide proof of payment of the special
assessment prior to or at the plea proceeding, the United States will
have the right to void this plea agreement.   In the event this plea
agreement becomes void after payment of the special assessment, such
sum shall be promptly returned to Mr. Glick.

     5.   **FORFEITURE.**  Mr. Glick hereby agrees as follows:

  (a)   To forfeit to the United States $488,954.46 representing
a portion of the proceeds traceable to the wire fraud and
mail fraud conspiracy charged in Count One pursuant to 28
U.S.C. § 2461(c) and 18 U.S.C. § 981(a)(1)(C), and the
unlawful monetary transactions charged in Count Eighteen
of the Indictment pursuant to 18 U.S.C. § 982(a)(1), and
the illegal structuring conduct undertaken by Mr. Glick
charged in Count Twenty-Six of the Indictment, pursuant
to 31 U.S.C. §§ 5317(c)(1), or as substitute assets
pursuant to 18 U.S.C. § 982(b)(1) and 21 U.S.C. § 853(p),
and, as such, consents to the entry of judgment against
him in this criminal action forfeiting same.

  (b)   Mr. Glick further agrees to consent to the entry of a
judgment in favor of the United States in this criminal
judicial case, which forfeits any and all right, title and
interest he may have in the following items, which were
in part seized by the United States on or about June 20,
2013, in full satisfaction of this forfeiture judgment:

    1.   Cashier's check #306701 dated June 20, 2013, in the
amount of $21,372.09 seized from Logan Bank & Trust
Account XXX4345 held in the name of Mr. Glick;

*6 6*
_____
Defendant's
Initials

James M. Cagle, Esquire
Michael W. Carey, Esquire
September 26, 2013                    Re: James Gregory Glick
Page 6

2.    Cashier's check #31980 dated June 20, 2013 in the
      amount of $20,038.45 seized from Premier Bank Account
      XXX5795 held in the name of Mr. Glick;

3.    The remaining balance of approximately $318.34 in
      Premier Bank Account XXX5795 held in the name of Mr.
      Glick;

4.    Wire transfer in the amount of $440,434.93 dated on
      or about June 20, 2013, from UBS Financial to the
      United States Treasury representing funds seized
      from UBS Account LV XX033 held in the name of Mr.
      Glick;

5.    Wire transfer in the amount of $1,173.79 dated on or
      about June 20, 2013, from UBS Financial to the United
      States Treasury representing funds seized from UBS
      Account LV XX033 held in the name of Mr. Glick; and

6.    The remaining balance of approximately $216.86 in UBS
      Account LVXX033 held in the name of Mr. Glick.

(c)   To indemnify the United States or otherwise make whole the
      value of any of the above-referenced items to which any
      other person may assert, or has asserted, a claim to lawful
      ownership;

(d)   To assist the United States and its agents in identifying
      all such property, regardless of its location and the
      manner in which it is titled, and to fully complete and
      execute, under oath, a Financial Affidavit in a form
      supplied by the United States which Affidavit shall be
      completed, signed and returned to counsel for the United
      States within seven calendar days from the date of signing
      this plea agreement;

(e)   To provide sworn testimony and to execute any documents
      deemed necessary by the United States to effectuate the
      forfeiture and to transfer title to the said property to
      the United States; and,

                                        C6
                                        _____
                                        Defendant's
                                        Initials

James M. Cagle, Esquire
Michael W. Carey, Esquire
September 26, 2013                    Re: James Gregory Glick
Page 7

(f)   To waive any defenses to this criminal action, or to any
      related administrative or judicial forfeiture action,
      based in whole or in part on the Excessive Fines Clause
      of the Eighth Amendment to the Constitution, or the holding
      or principles set forth in <u>United States v. Alexander</u>, 509
      U.S. 544 (1993); <u>United States v. Bajakajian</u>, 524 U.S. 321
      (1998); <u>United States v. Austin</u>, 509 U.S. 602 (1993) and
      their progeny.

6.   **RESTITUTION.**   Notwithstanding the offense of conviction,
Mr. Glick agrees that he owes restitution in the amount of $1,010,000
to General Star Indemnity Company and $3,900 to the City of Logan
and agrees to pay such restitution, with interest as allowed by law,
to the fullest extent financially feasible.   In aid of restitution,
Mr. Glick further agrees as follows:

(a)   Mr. Glick agrees to fully assist the United States in
      identifying and locating any assets to be applied toward
      restitution and to give signed, sworn statements and
      testimony concerning assets upon request of the United
      States.

(b)   Mr. Glick will fully complete and execute, under oath, a
      Financial Statement and a Release of Financial Information
      on forms supplied by the United States and will return
      these completed forms to counsel for the United States
      within seven calendar days from the date of the signing
      of this plea agreement.

(c)   Mr. Glick agrees not to dispose of, transfer or otherwise
      encumber any real or personal property which he currently
      owns or in which he holds an interest, including:

      1. Certain real property having a street address of 111
         Stratton Street, Logan, Logan County, West Virginia,
         together   with   all   improvements   thereon   and
         appurtenances thereto and being more fully described
         in that certain deed dated January 9, 2012, and recorded
         in the Office of the Clerk of the County Commission for

                                        _66_____
                                        Defendant's
                                        Initials

James M. Cagle, Esquire
Michael W. Carey, Esquire
September 26, 2013                          Re: James Gregory Glick
Page 8

Logan County, West Virginia, in Deed Book 606 at page 123. Said property is presently titled solely in the name of Mr. Glick;

2. Certain real property consisting of three parcels, nos. 5, 6 and the western half of no. 7 in Block 8 of the Middelburg Addition to the City of Logan, having a street address of 123 River Road, Logan, Logan County, West Virginia, together with all improvements thereon and appurtenances thereto, and being more particularly described in that certain deed dated September 6, 2012, and recorded in the Office of the Clerk of the County Commission for Logan County, West Virginia, in Deed Book 609 at page 199. Said property is presently titled solely in the name of Mr. Glick;

3. Certain real property having a street address of 592 Walnut Street, Logan, Logan County, West Virginia, together with all improvements thereon and appurtenances thereto, and being more particularly described in that certain deed dated April 12, 2010, and recorded in the Office of the Clerk of the County Commission for Logan County, West Virginia, in Deed Book 598 at page 561. Said property is presently titled solely in the name of Mr. Glick; and

4. A 2009 Chevrolet Tahoe with VIN 1GNFK23069R214454 registered with the West Virginia Division of Motor Vehicles in the name of Mr. Glick.

(d) Mr. Glick otherwise agrees to fully cooperate with the United States in the liquidation of all assets subject to collection for restitution, to execute any and all documents necessary to transfer title of any assets available to satisfy restitution, to release any and all right, title and interest he may have in and to such property, and waives his right to exemptions under the Federal Debt Collection Procedures Act upon levy against and the sale of any such property.

GG
Defendant's
Initials

James M. Cagle, Esquire
Michael W. Carey, Esquire
September 26, 2013                    Re: James Gregory Glick
Page 9

(e)  Mr. Glick agrees not to appeal any order of the District
     Court imposing restitution unless the amount of
     restitution imposed exceeds the amount set forth in this
     plea agreement.  However, nothing in this provision is
     intended to preclude the Court from ordering Mr. Glick to
     pay a greater or lesser sum of restitution in accordance
     with law.

7.  **PAYMENT OF MONETARY PENALTIES**.  Mr. Glick agrees not to
object to the District Court ordering all monetary penalties
(including the special assessment, fine, court costs, and any
restitution that does not exceed the amount set forth in this plea
agreement) to be due and payable in full immediately and subject to
immediate enforcement by the United States.  So long as the monetary
penalties are ordered to be due and payable in full immediately, Mr.
Glick further agrees not to object to the District Court imposing
any schedule of payments as merely a minimum schedule of payments
and not the only method, nor a limitation on the methods, available
to the United States to enforce the judgment.

8.  **COOPERATION**.  Mr. Glick will be forthright and truthful
with this office and other law enforcement agencies with regard to
all inquiries made pursuant to this agreement, and will give signed,
sworn statements and grand jury and trial testimony upon request of
the United States.  In complying with this provision, Mr. Glick may
have counsel present except when appearing before a grand jury.

9.  **USE IMMUNITY**.  Unless this agreement becomes void due to
a violation of any of its terms by Mr. Glick, and except as expressly
provided for in paragraph 11 below, nothing contained in any
statement or testimony provided by Mr. Glick pursuant to this
agreement, or any evidence developed therefrom, will be used against
Mr. Glick, directly or indirectly, in any further criminal
prosecutions or in determining the applicable guideline range under
the Federal Sentencing Guidelines.

10.  **LIMITATIONS ON IMMUNITY**.  Nothing contained in this
agreement restricts the use of information obtained by the United
States from an independent, legitimate source, separate and apart
from any information and testimony provided pursuant to this

GG
_____
Defendant's
Initials

James M. Cagle, Esquire
Michael W. Carey, Esquire
September 26, 2013                    Re: James Gregory Glick
Page 10

agreement, in determining the applicable guideline range or in prosecuting Mr. Glick for any violations of federal or state laws. The United States reserves the right to prosecute Mr. Glick for perjury or false statement if such a situation should occur pursuant to this agreement.

11. **STIPULATION OF FACTS AND WAIVER OF FED. R. EVID. 410.** The United States and Mr. Glick stipulate and agree that the facts comprising the offenses of conviction and relevant conduct include the facts outlined in the "Stipulation of Facts," a copy of which is attached hereto as "Plea Agreement Exhibit A."

Mr. Glick agrees that if he withdraws from this agreement, or this agreement is voided as a result of a breach of its terms by Mr. Glick, and Mr. Glick is subsequently tried on any of the charges in the indictment, the United States may use and introduce the Stipulation of Facts in the United States case-in-chief, in cross-examination of Mr. Glick or of any of his witnesses, or in rebuttal of any testimony introduced by Mr. Glick or on his behalf. Mr. Glick knowingly and voluntarily waives, see United States v. Mezzanatto, 513 U.S. 196 (1995), any right he has pursuant to Fed. R. Evid. 410 that would prohibit such use of the Stipulation of Facts. If the Court does not accept the plea agreement through no fault of the defendant, or the Court declares the agreement void due to a breach of its terms by the United States, the Stipulation of Facts cannot be used by the United States.

The United States and Mr. Glick understand and acknowledge that the Court is not bound by the Stipulation of Facts and that if some or all of the Stipulation of Facts is not accepted by the Court, the parties will not have the right to withdraw from the plea agreement.

12. **AGREEMENT ON SENTENCING GUIDELINES.** Based on the foregoing Stipulation of Facts, the United States and Mr. Glick agree that the following provisions of the United States Sentencing Guidelines apply to this case.

_66_
Defendant's
Initials

James M. Cagle, Esquire
Michael W. Carey, Esquire
September 26, 2013                    Re: James Gregory Glick
Page 11

Counts One, Eight, Eighteen, and Twenty-Six of the Indictment:

Count One

    USSG §2B1.1

    Base offense level                          7

    Loss greater than $1,000,000          + 16

    Reckless Risk of Death or Serious
    Bodily Injury                         +  2

    USSG Chapter Three Adjustments

    Obstruction of Justice §3C1.1         +  2

    Leadership Role §3B1.1                +  4

    Adjusted Offense Level                     31


Count Eight

    USSG §2K2.4

    Offense Created Substantial Risk
    Of Death or Serious Bodily Injury          24

    USSG Chapter Three Adjustments

    Obstruction of Justice                +  2

    Leadership Role §3B1.1                +  4

    Adjusted Offense Level                     30

*66*
Defendant's
Initials

James M. Cagle, Esquire
Michael W. Carey, Esquire
September 26, 2013                    Re: James Gregory Glick
Page 12

Count Eighteen

USSG §2S1.1

| | |
|---|---|
| Offense Level of Underlying Offense (Count One) | 31 |
| Conviction Under 18 U.S.C. § 1957 | + 1 |
| Adjusted Offense Level | 32 |

Count Twenty-Six

USSG §2S1.3

| | |
|---|---|
| Base offense level | 6 |
| Loss greater than $120,000 | + 10 |
| Proceeds Used Of Unlawful Activity | + 2 |
| Adjusted Offense Level | 18 |

Grouping Analysis

Pursuant to USSG § 3D1.2(b), the parties agree that Counts One, Eight, Eighteen and Twenty-Six involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting a part of a common scheme or plan.  Accordingly, the parties agree that the total adjusted offense level before consideration for acceptance of responsibility is 32.

The United States and Mr. Glick acknowledge and understand that the Court and the Probation Office are not bound by the parties' calculation of the United States Sentencing Guidelines set forth above and that the parties shall not have the right to withdraw from the plea agreement due to a disagreement with the Court's calculation of the appropriate guideline range.

_66_
Defendant's
Initials

James M. Cagle, Esquire
Michael W. Carey, Esquire
September 26, 2013                           Re: James Gregory Glick
Page 13

13. **WAIVER OF APPEAL AND COLLATERAL ATTACK.** Mr. Glick knowingly and voluntarily waives the right to seek appellate review of his conviction and of any sentence of imprisonment or fine imposed by the District Court, or the manner in which the sentence was determined, on any ground whatsoever including any ground set forth in 18 U.S.C. § 3742, so long as that sentence is at or below: a term of imprisonment of twenty years, a fine of $2,028,000 and a period of supervisory release not to exceed five years. The United States also waives its right to seek appellate review of any sentence of imprisonment or fine imposed by the District Court, or the manner in which the sentence was determined, on any ground whatsoever including any ground set forth in 18 U.S.C. § 3742, so long as that sentence is at or above the statutory minimum.

Mr. Glick also knowingly and voluntarily waives the right to challenge his guilty plea and his conviction resulting from this plea agreement, and any sentence imposed for the conviction, in any collateral attack, including but not limited to a motion brought under 28 U.S.C. § 2255.

The waivers noted above shall not apply to a post-conviction collateral attack or direct appeal based on a claim of ineffective assistance of counsel.

14. **WAIVER OF FOIA AND PRIVACY RIGHT.** Mr. Glick knowingly and voluntarily waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without any limitation any records that may be sought under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, or the Privacy Act of 1974, 5 U.S.C. § 552a, following final disposition.

15. **FINAL DISPOSITION.** The matter of sentencing is within the sole discretion of the Court. The United States has made no representations or promises as to a specific sentence. The United States reserves the right to:

(a) Inform the Probation Office and the Court of all relevant facts and conduct;

GG
————————
Defendant's
Initials

James M. Cagle, Esquire
Michael W. Carey, Esquire
September 26, 2013                    Re: James Gregory Glick
Page 14

    (b)   Present evidence and argument relevant to the factors enumerated in 18 U.S.C. § 3553(a);

    (c)   Respond to questions raised by the Court;

    (d)   Correct inaccuracies or inadequacies in the presentence report;

    (e)   Respond to statements made to the Court by or on behalf of Mr. Glick;

    (f)   Advise the Court concerning the nature and extent of Mr. Glick's cooperation; and

    (g)   Address the Court regarding the issue of Mr. Glick's acceptance of responsibility.

16. **VOIDING OF AGREEMENT.** If either the United States or Mr. Glick violates the terms of this agreement, the other party will have the right to void this agreement. If the Court refuses to accept this agreement, it shall be void.

17. **ENTIRETY OF AGREEMENT.** This written agreement constitutes the entire agreement between the United States and Mr. Glick in this matter. There are no agreements, understandings or recommendations as to any other pending or future charges against Mr. Glick in any Court other than the United States District Court for the Southern District of West Virginia.

Acknowledged and agreed to on behalf of the United States:

R. BOOTH GOODWIN II
United States Attorney

By: _____
THOMAS C. RYAN
Assistant United States Attorney

TCR/sdw

66
_____
Defendant's
Initials

James M. Cagle, Esquire
Michael W. Carey, Esquire
September 26, 2013                    Re: James Gregory Glick
Page 15

I hereby acknowledge by my initials at the bottom of each of the
foregoing pages and by my signature on the last page of this
fifteen-page agreement that I have read and carefully discussed every
part of it with my attorneys, that I understand the terms of this
agreement, and that I voluntarily agree to those terms and conditions
set forth in the agreement.  I further acknowledge that my attorneys
have advised me of my rights, possible defenses, the Sentencing
Guideline provisions, and the consequences of entering into this
agreement, that no promises or inducements have been made to me other
than those in this agreement, and that no one has threatened me or
forced me in any way to enter into this agreement.  Finally, I am
satisfied with the representation of my attorneys in this matter.


_____          _____
JAMES GREGORY GLICK                       9/27/2013
Defendant                                 Date Signed


_____          _____
JAMES M. CAGLE                            9/22/13
Counsel for Defendant                     Date Signed


_____          _____
MICHAEL W. CAREY                          9/27/13
Counsel for Defendant                     Date Signed

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON

UNITED STATES OF AMERICA

v.                                    CRIMINAL NO. 2:13-cr-00225-01

JAMES GREGORY GLICK

### STIPULATION OF FACTS

The United States and James Gregory Glick ("Mr. Glick") stipulate and agree that the facts comprising the offenses of conviction (Counts One, Eight, Eighteen and Twenty-Six in the Indictment in the Southern District of West Virginia, Criminal No. 2:13-cr-00225-01) include the following:

### The Scheme To Defraud

1.    Since approximately 2006, Mr. Glick has operated a restaurant and bar under the name 317 The Steakhouse ("317") through a corporation known as The Lewis Furniture Company, located at 110 Stratton Street in the town of Logan, Logan County, which is within the Southern District of West Virginia.

2.    Sometime in either November or early December 2011, a person known to the Grand Jury and Mr. Glick ("Known Person One") approached Mr. Glick about the vacant commercial office building across the street from 317 with an address of 111 Stratton Street.

3.    Known Person One told Mr. Glick that Known Person One had recently agreed to purchase 111 Stratton Street for $45,000.

4.    Mr. Glick and Known Person One discussed a plan to obtain a commercial insurance policy on the property, including fire coverage, and then have the building burned, in order to collect the insurance proceeds.

5.    Mr. Glick and Known Person One agreed to transfer the property from Known Person One to Mr. Glick purportedly for $50,000, then Mr. Glick would involve a mutual friend and

*66*
Defendant's
Initials

PLEA AGREEMENT EXHIBIT A

independent insurance agent, William Jamey Thompson, in the insurance fraud scheme and pay him $50,000 for getting the insurance policy.

6.  Mr. Thompson agreed to obtain a commercial insurance policy for Mr. Glick on 111 Stratton Street knowing the plan was to intentionally burn the building in order to collect the insurance proceeds.

7.  Mr. Glick and Known Person One agreed that after paying Mr. Thompson his cut and reimbursing Known Person One for the purchase of the building and ancillary costs, the two individuals would split the remaining insurance proceeds.

8.  Once the property was burned, then demolished, Mr. Glick would use the empty lot as a parking lot for 317.

## The Property Transfer

9.  On December 30, 2011, Known Person One paid the original owner of 111 Stratton Street $45,000.  Known Person One used an attorney whose office at the time was adjacent to 317 (the "Lawyer") to prepare the deed.

10.  Known Person One filed the deed at the Logan County Courthouse on or about January 11, 2012, located at Deed Book 606 Page 113.

11.  Known Person One and Mr. Glick then had the Lawyer prepare a deed flipping the property to Mr. Glick purportedly for $50,000.

12.  On or about January 13, 2012, a deed was filed at the Logan County Courthouse at Deed Book 606 Page 123 reflecting a closing date of January 9, 2012.

13.  Mr. Glick and Known Person One did not actually exchange any money as they both intended that Known Person One would be reimbursed from the fraudulent insurance proceeds.

*6 C*
_____
Defendant's
Initials

**PLEA AGREEMENT EXHIBIT A**

## The False and Fraudulent Insurance Application

14.  In the meantime, Mr. Glick and Known Person One worked with Mr. Thompson in preparing a false and fraudulent commercial insurance application.

15.  Although Mr. Glick and Mr. Thompson initially agreed to obtain insurance coverage for approximately $450,000 to $600,000, they were able to intentionally inflate the replacement cost value to $1 million using replacement cost estimations provided by Known Person One.

16.  To substantiate this material misrepresentation, Mr. Thompson wrote on the insurance application that Mr. Glick intended to renovate the building to lease to local professionals, including doctors and lawyers, generating $20,000 a month in income.

17.  On or about January 10, 2012, Mr. Thompson caused the false and fraudulent insurance application to be faxed from his office in Logan, to Risk Placement Services, Inc. ("RPS"), a wholesale commercial insurance broker in Lexington, Kentucky.

18.  It was reasonably foreseeable to Mr. Glick that Mr. Thompson would use interstate wires, i.e. facsimile transmissions, to place coverage for 111 Stratton Street as part of the scheme to defraud.

19.  RPS then shared the insurance quote with a number of insurance carriers, including General Star Indemnity Company ("General Star"), headquartered in Connecticut.

20.  Based on Mr. Glick and Mr. Thompson's false and fraudulent representations, General Star agreed to insure 111 Stratton Street for $1 million.

21.  On or about January 17, 2012, General Star issued a commercial insurance policy covering 111 Stratton Street.

22.  Mr. Glick paid an approximate $5,800 premium.

*66*
_____
Defendant's
Initials

**PLEA AGREEMENT EXHIBIT A**

3

## The Alibi

23. Mr. Glick had previously scheduled a business trip to Louisville, Kentucky to attend a food show on January 31, 2012, hosted by 317's distributor, Sysco Foods.

24. Mr. Glick had already planned to go on the trip with his girlfriend and two others. As such, Mr. Glick would have witnesses placing him away from the scene of the crime.

25. With the insurance coverage in place, Known Person One and Mr. Glick agreed that executing the arson while Mr. Glick was out of town would be ideal to provide him an alibi.

26. Further, if questioned on the arson, Mr. Glick would state that he was in the process of renovating the office space to be shared in one half by Psychological Associates of Logan, Inc. and he had a doctor lined up to rent the other half.

27. Psychological Associates of Logan, Inc. used to rent office space from him in another building in Logan, but moved several years prior because the business could not afford to pay Mr. Glick $700 a month in rent.

28. To substantiate the cover story, Mr. Glick hired two laborers who had been working on renovations at his Middleburg home to begin demolition of the existing office space inside 111 Stratton Street as part of a cover story.

29. The week before the fire in late January 2012, Mr. Glick had the two laborers gut the entire office space on the left side of 111 Stratton Street.

## Execution of the Arson

30. Known Person One and Mr. Glick agreed that Known Person One would have a person known to the Grand Jury and Mr. Glick ("Known Person Two") ask a mutual associate, Guy Miller, if he would arrange to have 111 Stratton Street intentionally burned while Mr. Glick was out of town.

31. Known Person Two would be paid for his involvement out of Known Person One's half of the insurance proceeds.

*GG*
_____
Defendant's
Initials

**PLEA AGREEMENT EXHIBIT A**

32.  Mr. Miller was a known distributor of illegal prescription pills, who purportedly operated a legitimate vacuum sales business during the day and an exotic dance club known as "L.A.'s Finest" at night.

33.  Known Person Two approached Mr. Miller and he agreed to burn the building with the help of two others for $5,000.

34.  Mr. Miller scouted the downtown area of Logan and developed a plan to execute the arson.

35.  Mr. Miller devised a plan to borrow the Lawyer's office key.

36.  Then, he and the other two individuals he recruited would park in the parking lot on the Main Street side of the Lawyer's office.

37.  The three individuals would pass through the Lawyer's office exiting onto Stratton Street, then enter Stratton Street, spread gasoline and then exit back through the Lawyer's office and drive away.

38.  In order for Mr. Miller's plan to work, the gasoline needed to already be in the building and he would need a key.

39.  Before leaving for Louisville, Mr. Glick went to B&B Loans at the corner of Stratton Street and Dingess Street and had a spare key made, which he gave to Known Person One, who in turn gave the key to Mr. Miller.

40.  On January 30, 2012, Mr. Glick prepared to leave for Louisville for the Sysco food show.

41.  Mr. Glick's laborers had work on another job so they would not be working on 111 Stratton Street for several days, making his Louisville trip an opportune time to execute the arson.

42.  Based on a conversation between Mr. Glick and Known Person One, when the two laborers started work the week before, Mr. Glick had instructed the men to demolish the walls and pile

_GC_
Defendant's
Initials

**PLEA AGREEMENT EXHIBIT A**

5

the wooden debris in the middle of the floor thereby exposing the most wood possible and to create essentially kindling to ensure the fire would destroy the entire building.

43. Also, Mr. Glick had taped black plastic bags over the windows facing Stratton Street so no one from the street could see into the building.

44. Known Person One left the back door unlocked and then gave Mr. Miller the key to the front door.

45. That same day, Mr. Miller arranged to have three five-gallon gas cans placed in the rear part of 111 Stratton Street entering through the back door.

46. The next day, on January 31, 2012, while in Louisville, Mr. Glick got a call from a valuation inspector on behalf of General Star to arrange an inspection of 111 Stratton Street verifying the $1 million replacement cost value.

47. Knowing that Mr. Miller planned to burn the building that night, Mr. Glick informed the valuation inspector that he was out of town but would be in contact to schedule an inspection when he returned.

48. At approximately 1:45 a.m. on the morning of February 1, 2012, Mr. Miller, a person that Mr. Glick only knew as Mr. Miller's "cousin," and another individual known to the Grand Jury ("Known Person Three") drove in Mr. Simon's steel gray Chevrolet Malibu to the parking lot on the Main Street side of the Lawyer's office and 317.

49. From there, the individuals entered the Lawyer's office using the key obtained by Mr. Miller then crossed the street and entered 111 Stratton Street.

50. At approximately 2:09 a.m. on February 1, 2012, Mr. Miller, Mr. Simon and Known Person Three intentionally set fire to 111 Stratton Street.

51. They used so much gasoline that the fumes caused an explosion blowing a hole in the top right portion of the front exterior to 111 Stratton Street.

_66_
Defendant's
Initials

**PLEA AGREEMENT EXHIBIT A**

6

52.   Mr. Miller, Mr. Simon and Known Person Three then left the scene by proceeding back through the Lawyer's office to Mr. Simon's car parked in the lot on Main Street.

53.   During the course of fire suppression efforts, Logan Fire Chief Scott Beckett injured his knee.

### The Cover Story

54.   Mr. Glick received a phone call in Louisville at approximately 4:30 a.m. from his alarm company that power had been shut off to 317 because of a fire in a nearby building.

55.   At approximately 9:30 a.m., Known Person One called Mr. Glick and told him that 111 Stratton Street had been burned.

56.   Mr. Glick returned from Louisville and met with West Virginia Assistant State Fire Marshal Baltic, who was on the scene conducting an arson investigation.

57.   Mr. Glick told Baltic the concocted alibi.  That is, Mr. Glick stated that he recently purchased the building from Known Person One and was in the process of renovating it.

58.   Mr. Glick falsely stated he was going to use half of the building as office space for Psychological Associates of Logan, Inc. and had spoken to Dr. Fernando Gonzalez-Ramos about renting the other half.

59.   Dr. Gonzalez had previously rented space for weekends only from Mr. Glick for $300 per month cash in another building Mr. Glick owned in Logan.

60.   Mr. Glick had discussed renting different office space around Logan with Dr. Gonzalez, but never spoke to him about renting space in 111 Stratton Street.

### Destruction of Evidence

61.   Sometime later, Mr. Glick realized that security video camera outside of the 317 Main Street entrance captured Mr.

_66_
Defendant's
Initials

**PLEA AGREEMENT EXHIBIT A**

Miller, Mr. Simon and Known Person Three entering and exiting the Lawyer's office just before and after the fire.

62. Mr. Glick told Known Person One, who in turn told Known Person Two, who in turn told Mr. Miller.

63. Either that day or the next, Mr. Miller came to 317.

64. Mr. Glick and Mr. Miller agreed that the security system's digital video recorder ("DVR") needed to be destroyed in case law enforcement requested the video.

65. Mr. Miller removed the DVR and destroyed it, thereby destroying evidence of the crime.

66. On or about February 3, 2012, Mr. Glick contacted his security company and told him he needed a new DVR because the existing one was malfunctioning.

### Fraudulent Insurance Claim

67. With the aid of Mr. Thompson, Mr. Glick submitted a fraudulent insurance claim on or about February 8, 2012.

68. The claim form was sent via facsimile from Mr. Thompson's office to RPS in Lexington, Kentucky, who then forwarded the form onto to General Star.

69. Further, on or about April 17, 2012, Mr. Glick submitted a Sworn Statement in Proof of Loss, via facsimile from Logan to Lexington, Kentucky, affirmatively stating that he was not involved in causing the February 1, 2012 fire.

70. Without proof of Mr. Glick's involvement, General Star sent a check in the amount of $1,010,000 via Federal Express from its office in Connecticut to 317, constituting a full payout on Mr. Glick's fraudulent insurance claim.

71. Mr. Glick acknowledges that Mr. Thompson's use of interstate wire transmissions, i.e. facsimile transmissions, and General Star's use of Federal Express both were reasonably foreseeable in the execution of the scheme to defraud General Star.

*66*
—————————
Defendant's
Initials

**PLEA AGREEMENT EXHIBIT A**

8

## Money Laundering Transactions

72. Within a week of receipt of the check, Mr. Glick drove the check to his stock broker in Cincinnati, Ohio, who worked for UBS Financial ("UBS").

73. Mr. Glick opened a new trading account, Account LV XX033, and deposited the entire proceeds of the fraud into the account (the "UBS Account").

74. Mr. Glick then began actively speculative trading in stocks and derivatives with the proceeds of the mail fraud and wire fraud scheme.

75. Also, Mr. Glick engaged in a series of wire transfers of amounts of $10,000 or more from the UBS Account, knowing those funds represented criminally derived property.

76. Mr. Glick admits that each of the wire transfers referenced in Counts Ten through Eighteen constitutes unlawful monetary transactions in excess of $10,000 of criminal derived property.

77. For example, as referenced in Count 17 of the Indictment, on or about May 6, 2013, Mr. Glick wired $49,160.23 from the UBS Account to the trust account of the law offices of Abraham & Ildertaon PLLC in Logan.

78. Previously, Mr. Glick was in the process of refinancing his home working with Carl Adkins, a lawyer practicing in Logan.

79. Mr. Adkins was killed in an accident.

80. The law offices of Abraham & Illderton agreed to take a portion of Mr. Adkins' files for unfinished matters, which included Mr. Glick's refinance.

81. In order to improve his debt-to-equity ratio and obtain a more favorable interest rate on the refinance, Mr. Glick wired the funds from the UBS Account to pay off several car loans.

GC
———————————
Defendant's
Initials

**PLEA AGREEMENT EXHIBIT A**

82. The law offices of Abraham & Ilderton closed the property refinance, but were otherwise not aware of the source of Mr. Glick's funds that he used to pay off the car loans.

83. Also, as set forth in Count Eighteen, on or about May 24, 2013, Mr. Glick wired $125,000 from the UBS Account to a personal account he held at Logan Bank & Trust ("LB&T").

84. Mr. Glick used a portion of those funds to pay Known Person One and Known Person Two their share of the fraud proceeds.

85. Mr. Glick had previously paid Mr. Thompson his $50,000 cut of the fraud proceeds.

## Illegal Structuring Transactions

86. To conceal the cash payouts to Known Person One, Known Person Two and Mr. Thompson, Mr. Glick "structured" cash withdrawals from the LB&T Account.

87. Specifically, since at least October 2008, Mr. Glick knew that if he deposited or withdrew more than $10,000 from a bank, the bank was obligated to file a Currency Transaction Report ("CTR") with the IRS.

88. Over at least the last five years, Mr. Glick engaged in a series of cash transactions, including deposits and withdrawals, on a number of occasions for the specific purpose of avoiding the filing of a CTR by LB&T.

89. After the February 1, 2012 arson, Mr. Glick transferred fraud proceeds from the UBS Account to his local LB&T Account, and then withdrew cash out of the LB&T Account over several transactions, all of which were in amounts of $10,000 or less to avoid the CTR filing requirement, so he could pay Known Person One, Known Person Two and Mr. Thompson.

90. For example, as set forth in Counts Twenty-Four, Twenty-Five and Twenty-Six of the Indictment, Mr. Glick withdrew $9,500 on three successive days at the end of May 2013.

_66_
Defendant's
Initials

**PLEA AGREEMENT EXHIBIT A**

91.  Mr. Glick purposefully withdrew the cash in amounts of $10,000 or less on successive days to avoid the filing of a CTR.

92.  Mr. Glick used a portion of that cash to pay Known Person One and Known Person Two.

93.  Mr. Glick acknowledges that each of the transactions set forth in Counts Nineteen through Thirty-Six was conducted for the purpose of avoiding LB&T's CTR filing requirement.

### Tax Evasion Related Conduct

94.  Mr. Glick admits that he willfully attempted to evade the payment of certain taxes associated with the operation of 317, including the payment of wages in the form of cash to avoid associated payroll taxes.

95.  Further, Mr. Glick admits that he did not report the $1,010,000 check he received on or about May 15, 2012 to his accountant.

96.  Accordingly, the receipt of that money is not reflected on his 2012 IRS Form 1040 personal income tax return.

### Post-Seizure Warrant Obstructive Conduct

97.  On June 20, 2013, special agents from the Internal Revenue Service ("IRS") executed seizure warrants on the UBS Account, the LB&T Account and a personal account that Mr. Glick held at Premier Bank (the "Premier Account").

98.  The agents notified Mr. Glick that morning of the seizure and that he was the target of a federal criminal arson and insurance fraud investigation.

99.  Shortly thereafter, Mr. Glick engaged in a plan to obstruct the investigation.

100. Specifically, Mr. Glick was concerned that Mr. Miller may cooperate with the investigation if questioned.

_66_
Defendant's
Initials

**PLEA AGREEMENT EXHIBIT A**

101. Further, Mr. Miller told Mr. Glick that his cousin or Known Person Three may cooperate with law enforcement if approached.

102. On or about July 20, 2013, Mr. Glick paid Mr. Miller $8,000 to ensure that he, his cousin and Known Person Three would lie to the investigators and grand jury if questioned about their involvement in the arson, or otherwise not cooperate.

103. Mr. Glick levied a number of threats of death and serious bodily harm against anyone who cooperated in the investigation, including indicating that he or others would harm the family members of anyone that cooperated in the investigation.

104. Mr. Glick admits that this conduct was undertaken in an effort to obstruct the ongoing federal criminal investigation into his involvement in the arson and insurance fraud scheme arising out of the February 1, 2012 fire at 111 Stratton Street.

Stipulated and agreed to:

_____          _____
JAMES GREGORY GLICK                         Date Signed
Defendant

_____          _____
JAMES M. CAGLE                              Date Signed
Counsel for Defendant

_____          _____
MICHAEL W. CAREY                            Date Signed
Counsel for Defendant

_____          _____
THOMAS C. RYAN                              Date Signed
Assistant United States Attorney

                                            _____
                                            Defendant's
                                            Initials

**PLEA AGREEMENT EXHIBIT A**

12