IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON

**UNITED STATES OF AMERICA**

**v.**                                    CRIMINAL NO. 2:13-00225-01

**JAMES GREGORY GLICK**

**UNITED STATES RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM
AND REQUEST FOR VARIANCE**

Comes now the United States of America, by Thomas C. Ryan, Assistant United States Attorney for the Southern District of West Virginia, and respectfully files this response to Defendant's Sentencing Memorandum and Request for a Variance.

## I. Summary of the Offense

In this case, Defendant's unadulterated greed is only rivaled by his bold disregard for others' property or safety.  In the heart of downtown Logan – a place in which he has lived most of his life, served on city council, raised a family and operated a successful restaurant – Defendant was willing to torch a commercial building, risking destroying an entire city block to fleece an out-of-state insurance company of $1 million.

The most unnerving part of Defendant's conduct is that he and his co-conspirators nearly got away with it.  These sophisticated individuals developed a plan that was, frankly, rather ingenious. Defendant Glick handled the insurance angle with Defendant Thompson while the Allies hired Defendant Miller and his crew to set the fire.

They compartmentalized the execution of the scheme to limit the amount of information each participant necessarily knew about each other's involvement: plausible deniability.

After the fire, Defendant smoothly answered questions from the insurance company's arson investigators. He appeared sincere. According to his version of the events, the case was clearly arson but it must have been some vagrants or other miscreants. He just happened to be the lucky benefactor of someone else's misdeeds.

The group made one critical mistake. Miller and his crew poured too much gasoline causing a massive explosion blowing the top front of the building across Stratton Street. That caused them to leave in such a hurry that Miller forgot to lock the Lawyer's door on the Stratton Street. Sometime during the course of fighting the fire, Logan Firefighter Wendy Perry stepped back and took a break. She went to lean against the Lawyer's door and realized it was unlocked.

Firefighter Perry remembered the oddity when she was interviewed by the West Virginia State Police in October 2012. By that time, the agents had established the longstanding drug dealing relationship between Miller and the Lawyer. Further, the agents had learned that Miller had dealings with Glick, Thompson and the Allies. The fire began to look more than just coincidental and a clearer

picture began to develop. Had Miller locked the Lawyer's door, it is difficult to say that this case would have been made.[1]

Finally in early 2013, special agents from the Internal Revenue Service became actively involved. Defendant's suspicious banking activities had been of interest for some time. After Defendant received the $1 million insurance payout in May 2012, Defendant deposited the check into a trading account at UBS. Beginning a couple of months later, the agents began seeing a pattern of transfers from the UBS Account to Defendant's local LB&T account, followed by structured cash withdrawals: the telltale sign of co-conspirator payouts. Further, the agents could see that the $1 million was dissipating quickly.

On June 20, 2013, the agents moved swiftly with warrants, seizing the accounts Defendant used to launder the fraud proceeds, nabbing approximately $400,000. The IRS and WVSP knocked on Thompson's door first. He feigned ignorance. The agents then knocked on Glick's door. He displayed a fair amount of righteous indignation when learning of the seizure warrants and denied all involvement.

The agents went to visit Miller and pointed out to him that he was in the most unique position to help himself. Miller could plead guilty to his pending drug charges then provide the information he

---

1   This is particularly true in light of the decision by co-defendants Glick, Miller and Simon to destroy the 317 DVR.

knew of the arson scheme pursuant to the terms of a plea agreement. Miller declined the offer. Miller was served with a grand jury subpoena.

The agents went to visit Jamil Allie. He initially stuck to the story. Within a few days, however, Jamil Allie realized that the authorities were closing in. He and his brother decided to confess their involvement and conduct covert consensual recordings to corroborate the others' involvement.

For the next six weeks, the recordings revealed not only the full scope of the fraud, but the unfathomable lengths these defendants would go to corrupt the investigative process. On July 14, 2013, co-defendant Thompson – a trained Marine sniper – "promised" Jamil Allie during a recorded conversation in Allie's garage that he would get anyone who cooperated from "a mile away." See Exhibit A.[2]

The next day, co-defendant Miller told Mike Allie during a secret meeting in Charleston that he needed hush money to give to co-defendant Simon because he was afraid he was going to talk. Exhibit B.[3] The agents authorized Mike Allie to deliver $2,000, which Miller accepted, agreeing to lie in the grand jury.

---

2    These exhibits were presented at the September 6, 2013 detention hearing. The United States will be prepared to play the recordings during the hearing, if the Court so desires.
3    According to Miller, he only used Simon's name, but did not involve him in the conspiracy to obstruct the grand jury process.

On July 16th, during Little League batting practice at a baseball field in Logan, Defendant Glick told Jamil Allie that he believed that they needed to pay co-defendant Miller and his crew additional hush money, and then threaten Miller and his family if he returned for more money. See Exhibit C.[4]

Two days later, the agents instructed Jamil Allie to contact Defendant Glick and inform him that Jamil Allie was no longer going to pay co-defendant Miller any further hush money. Defendant Glick proceeded forward with the obstruction scheme and paid co-defendant Miller another $8,000. See Exhibit D.

As the investigation continued, Defendant Glick called a clandestine meeting on August 11, 2013, on a deserted road with Jamil Allie and co-defendant Thompson. See Exhibit E. To prove they were not wearing recording devices, Thompson and Glick disrobed. Jamil Allie was able to placate their suspicions although he was indeed wearing recording equipment. During that meeting, Defendant Glick mentioned that "graves will be popping everywhere" when discussing whether the group believed any of the co-conspirators were cooperating.

---

4   Exhibit C is an excerpt from a July 16, 2013 recorded conversation between Defendant Glick and Jamil Allie during Little League batting practice at a baseball field in Logan in which Defendant Glick states that it is necessary for he and Allie to pay Miller hush money, but only in exchange for a list of the names, addresses, and phone numbers of Miller's close relatives.

At that point, the agents decided to terminate the consensual recordings. The co-conspirators were indicted on August 30, 2013, and arrested on September 3, 2013.

## II. **Response to Defendant's Request for a Variance**

Defendant requests the Court to vary from the advisory guideline range of 87 to 108 months to a mandatory minimum of sixty months. See Defendant's Sentencing Memorandum, Docket No. 161. The request should be rejected in all respects.

First, the primary basis for Defendant's request is the "immense" disparity between the punishment to which he is exposed compared to that of the two co-conspirators, Jamil Allie and Mike Allie, who were afforded use immunity as a result of their proactive cooperation.

To be sure, the "disparity" in this case is warranted and it is intentional. The United States believes between 87 and 108 months will send a strong deterrent message to the white-collar criminal element in the Logan County area of the Southern District of West Virginia: Engage in efforts to thwart the legitimate investigative process of a federal grand jury and face harsh consequences.

Further, the use immunity provided to the Allies was necessary because of Defendant's own personal effort to intentionally obstruct the grand jury process. Defendant Glick's decision to let co-defendants Miller and Simon destroy the digital video recorder

from the 317 Steakhouse compromised a critical piece of direct evidence. Had the agents obtained that recording – which would have quickly pieced together the events of the night of February 1, 2012 – it may not have been necessary to afford the Allies use immunity following their ongoing cooperation. Also, had Defendant Glick decided not to bribe co-defendant Miller, he certainly would have provided strong testimony pursuant to the immunity provision of his plea agreement.

In short, the Allies were faced with strong circumstantial evidence from law enforcement implicating them in a $1 million insurance fraud and arson scheme. They quickly confessed and agreed to risk their lives to corroborate the information they provided. Their cooperation allowed the government to avoid the expense of a trial. When faced with the same facts, Defendant chose otherwise.

The one undeniable fact is this: Law enforcement knocked on Defendant Glick's door first and he chose to not only not cooperate, but to proactively engage in efforts to undermine the federal investigation. Any argument at this juncture for a variance because he chose unwisely is the only thing that is "unwarranted."

### III. Cooperation

Following execution of the first plea agreement, Defendant was debriefed by law enforcement. He provided information that has been of some assistance to law enforcement in an ongoing federal criminal

investigation. The results, however, of any assistance provided by Defendant may not be known for some time and the United States is not yet in a position to evaluate its value. Rather than further continue Defendant's sentence, particularly in light of his incarcerated status, the United States believes the value of Defendant's assistance can be appropriately addressed under Rule 35, if warranted.

## IV. Conclusion

Based on the foregoing, the United States urges this Court to reject Defendant's request for a variance.

                                              Respectfully submitted,

                                              R. BOOTH GOODWIN II
                                              United States Attorney

                                              s/*Thomas C. Ryan*
                                              Assistant United States Attorney
                                              WV State Bar No. 9883
                                              300 Virginia Street, East
                                              Room 4000
                                              Charleston, West Virginia 25301
                                              Telephone: 304-345-2200
                                              Fax: 304-347-5104
                                              E-mail: thomas.ryan@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

It is hereby certified that the foregoing "RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM" has been electronically filed and service has been made on opposing counsel by virtue of such electronic filing this 20th day of May, 2014 to:

    James Cagle, Esquire
    caglelaw@aol.com

    Michael W. Carey, Esquire
    mwcarey@csdlawfirm.com


    s/*Thomas C. Ryan*
    THOMAS C. RYAN
    Assistant United States Attorney
    WV State Bar No. 9883
    300 Virginia Street, East
    Room 4000
    Charleston, West Virginia 25301
    Telephone:  304-345-2200
    Fax:  304-347-5104
    E-mail:  thomas.ryan@usdoj.gov